### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF FLORIDA
### PANAMA CITY DIVISION


**SANDRA D. PARISH,**

     **Plaintiff,**

**vs.**                               **Case No.  5:15cv47-CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social**
**Security,**

     **Defendant.**

_____/

### <u>MEMORANDUM OPINION AND ORDER</u>

This is a Social Security case referred to the undersigned U.S. Magistrate Judge upon consent of the parties and reference by District Judge Richard Smoak.  Doc. 10. *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's application for Title XVI Supplemental Security Income (SSI) benefits.  After careful consideration of the entire record, the decision of the Commissioner is affirmed.

## I.  Procedural History

On February 8, 2011, Plaintiff, Sandra D. Parish, filed an application for SSI benefits alleging disability beginning December 1, 2011, based on problems with her knees, hips, lower back, neck and shoulders, and high blood pressure.  R. 23, 204-11, 228, 232, 258, 298.  (Citations to the record shall be by the symbol "R." followed by a

page number that appears in the lower right corner.)  During the hearing, Plaintiff

amended her alleged onset date to February 8, 2011, the date the application was filed.

R. 47.

Plaintiff's application was denied initially on March 30, 2011, and upon

reconsideration on May 31, 2011.  R. 23, 110-11, 113-21.  On June 15, 2011, Plaintiff

requested hearing.  R. 23, 125-27.  On March 11, 2013, Plaintiff appeared in Panama

City, Florida, and testified at a video hearing conducted by Administrative Law Judge

(ALJ) Stacy Paddack in Tallahassee, Florida.  R. 23, 43-74.[1]  Robert N. Strader, an

impartial vocational expert, testified during the hearing.  R. 23, 65-69, 203 (Resume).

Plaintiff was represented by Scott Haynes, an attorney.  R. 23, 43, 45, 195-96.

Toward the end of the hearing, Plaintiff responded favorably that she was willing

to go to a neurologist for testing if requested by the ALJ.  R. 70.  Plaintiff's

representative did not mention during the hearing that additional prior medical records

were needed for the ALJ to decide the case.  *See, e.g.* R. 46 (Exhibits admitted into

evidence).  After the hearing, a consultative examination report was submitted by

E. Jacob, M.D., MRCP, a board certified neurologist, dated April 2, 2013.  R. 511-523,

527; *see infra* at 19-20; see also R. 327 (Plaintiff's representative advising ALJ of

receipt of Dr. Jacob's report and advocating ALJ should give great weight to Mark R.

Akerson's, M.D., RFC report, R. 507-10).

It was not until October 17, 2013, when Plaintiff's current representative argued

before the Appeals Council, not the ALJ, that the ALJ did not properly develop the

record by failing to request outstanding treatment records from Internal Medicine

---

[1]  The hearing was originally scheduled for October 24, 2012, but rescheduled at
the request of Plaintiff's representative.  R. 72-74, 157.

Associates (IMA) post-March 2011.  R. 329, 331, 360-76 (Exhibit 4F); *see* doc. 14 at 23.

Also, it does not appear Plaintiff's counsel provided the Appeals Council, and has not

provided this Court, with the additional records.  Doc. 14.

On July 29, 2013, the ALJ issued a decision denying Plaintiff's application for

benefits.  R. 23-37.  On August 13, 2013, Plaintiff, by her current lawyer, filed a request

for review and filed a brief on October 17, 2013.  R. 15-17, 328-34.  On January 2,

2015, the Appeals Council denied Plaintiff's request for review, noting that it had

considered Plaintiff's brief, making the ALJ's decision the final decision of the

Commissioner.  R. 1-6; *see* 20 C.F.R. § 404.981.

On March 6, 2015, Plaintiff filed a Complaint with this Court seeking review of the

ALJ's decision.  Doc. 1.  The parties filed memoranda of law, docs. 14 and15, which

have been considered.

## II.  Findings of the ALJ

The ALJ made several findings:

1. "The claimant has not engaged in substantial gainful activity since February 8, 2011, the application date."  R. 25.

2. "The claimant has the following severe impairments: status-post bilateral carpel tunnel release; hypertension; myalgia; and obesity."  *Id.*  The ALJ determined that several of Plaintiff's reported impairment were non-severe. R. 25-26.  In addition, the ALJ rejected Plaintiff's "subjective complaints of fibromyalgia" and determined that "the longitudinal medical record is inconsistent with the criteria outlined in Social Security Ruling [SSR] 12-2p for evaluating fibromyalgia and does not support a finding of a medically determinable impairment."  R. 26.

3. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  *Id.*

4. "[T]he claimant has the residual functional capacity [RFC] to perform light work as defined in 20 CFR 416.967(b), except she requires an 'at will'

sit/stand option; she cannot climb ladders, ropes, and/or scaffolds, but can occasionally climb ramps and stairs; she can occasionally balance, stoop, crouch, kneel, and/or crawl; she cannot reach overhead with her left non-dominant hand, but id able to constantly reach in all other directions; she is limited to frequent gross and fine manipulation with her left non dominant hand; she should avoid concentrated exposure to excessive vibration, moving machinery, and unprotected heights; and she is limited to simple, routine, and repetitive tasks due to pain distraction."  R. 29.

5.  "The claimant is unable to perform any past relevant work."  R. 35.

6.  "The claimant has a limited education and is able to communicate in English" and "[t]ranferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules [Grids] as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills."  *Id.*

7.  "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform" such as ticket taker and seller and office helper, all light, unskilled jobs within SVP of 2.  R. 35-36.[2]

8.  "The claimant has not been under a disability, as defined in the Social Security Act, since February 8, 2011, the date the application was filed."  R. 36.

## III.  Legal Standards

This Court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial

evidence is more than a scintilla, but less than a preponderance.  It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

---

[2]  "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 416.968(a).  An SVP of 2 means "[a]nything beyond short demonstration up to and including 1 month." Dictionary of Occupational Titles (DOT) (4th Ed., Rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b).

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual

findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).

 A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 423(d)(1)(A); see 20 C.F.R. § 416.909 (duration requirement).

Both the "impairment" and the "inability" must be expected to last not less than 12

months.  Barnhart v. Walton, 535 U.S. 212 (2002).

 The Commissioner analyzes a claim in five steps.  20 C.F.R. § 416.920(a)(4)(i)-

(v):

  1.  Is the individual currently engaged in substantial gainful activity?

  2.  Does the individual have any severe impairments?

  3.  Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

  4.  Does the individual have the residual functional capacity (RFC) to perform work despite limitations and are there any impairments which prevent past relevant work?[3]

---

[3]  An RFC is the most a claimant can still do despite limitations.  20 C.F.R. § 416.945(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining

5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 416.920(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

---

physicians or other persons, and medical records.  *Id.*  The responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 416.946(c); *see* Social Security Ruling (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term "*residual functional capacity assessment"* describes an adjudicator's finding about the ability of an individual to perform work-related activities.  The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.").

## IV.  Evidence

### A.  Background

Plaintiff was born on February 4, 1960, and was 51 years old as of the amended alleged onset date, February 8, 2011.  R 228.  Plaintiff reported completing the eleventh grade and having automotive training.  R. 50, 233.  Her past work positions included housekeeper and auto parts salesperson.  R 67, 233.  She reported continuing to work as a housecleaner once a week for $50 a week, but the ALJ determined that this work activity did not rise to the level of substantial gainful activity.  R 25, 50, 233.  She reported having taken Atenolol and Lisinopril for high blood pressure, Lexapro and Wellbutrin for pain, and Flexeril and Elavil for her knees, hips, lower back, neck and shoulders.  R 235, 287, 300.  She reported to the SSA on November 9, 2011, that she was diagnosed in October 2011 with fibromyalgia by Dr. Steven Spence at Internal Medicine Associates (IMA) in Marianna, Florida, and was then currently taking new medication -- Flexeril, Cymbalta, Cetirizine, Omeprazole, and Sucralsate.  R 304.

### B.  Medical Evidence

According to Plaintiff, Plaintiff's treating primary care physician has been Dr. Akerson of Panhandle Family Care Associates (PFCA) since July 8, 2005.  R. 507-08; *see* doc. 14 at 4.  Plaintiff refers to Dr. Akerson's Residual Functional Capacity Questionnaire dated November 6, 2012, to support this statement, not to any specific patient records.  *Id.*  On February 29, 2012, Dr. Akerson noted, in part: "First time pt here to establish care and to discuss medications" and that "[t]he patient has not been seen by any other health care provider since the last visit."  R. 460; *see infra* at 11-13.

The last visit, prior to February 29, 2012, with PFCA appears to have been in March 26, 2007, with John A. Spence, M.D., and Kim Aycock.  R. 466-67, 485-86.

On March 26, 2007, Plaintiff presented for treatment before Dr. John A. Spence with PFCA, and complained of bilateral hand numbness and constant tingling in her hands which had started one year prior.  R 466.  She reported that she woke up at night with pain in all fingers.  *Id.*  Bilateral wrist pain and poor grip strength were observed.  *Id.*  Tinels and phalens were positive for both the left and right arms.  *Id.*  Dr. Spence diagnosed Plaintiff with wrist pain caused by bilateral carpal tunnel syndrome.  R. 467.  Dr. Spence injected Kenalog and Lidocaine into the left carpal tunnel and prescribed Lortab as needed for pain.  *Id.*  Dr. Spence indicated that if Plaintiff's condition was no better, a referral to TOC should be considered and in April 2007, Plaintiff was referred to TOC for bilateral carpal tunnel syndrome.  *Id.*  There are no patient records from TOC.  Plaintiff's next visit with Dr. Spence was on August 14, 2012.  R. 457-59; *see infra* at 12.

Dr. Spence also reported on March 26, 2007, Plaintiff had a July 8, 2005, onset of a migraine headache and strep throat, and carpal tunnel syndrome on March 26, 2007, and that Plaintiff was prescribed Lortab for the first time and that Lunesta, Lortab (for pain as needed), Maxalt, Phenergan (for nausea as needed), Ultracet (for pain as needed), and Amoxicillin (for infection) were started on *July 8, 2005*.  R. 466, 485.  On February 29, 2012, Dr. Akerson noted that Lunesta, Lortab (for pain as needed), Maxalt, Phenergan (for nausea as needed), Ultracet (for pain as needed), and Amoxicillin (for infection) were started on *July 8, 2005*.  R. 451; *see* R. 466, 485 (Mar. 26, 2007-Dr. John A. Spence noting same).  It is a fair inference that Plaintiff may have begun

seeking medical care at PFCA on July 8, 2005, but not necessarily under Dr. Akerson's direct care.

On October 5, 2010, Plaintiff established care at IMA clinic with Kim Dykes, ARNP, to address her blood pressure issues since January 2010.  R 340-42, 366-68. (It appears that Steven Spence, M.D., initialed the patient notes.  R. 342, 360.) Plaintiff's problems were listed as chronic pain related to injuries sustained in a motor vehicle accident in 1996 including bilateral hip injury, C-spine and L-spine, as well as head injury, migraine headaches, endometrial cancer, carpal tunnel syndrome bilateral status post release, a sexual assault in 1989, central obesity, history of depression, and seasonal allergies.  R. 340, 366.  She reported that she had been low on energy lately and very hot all the time.  *Id.*  She had no acute complaints.  *Id.*  Nurse Practitioner (NP) Dykes indicated Plaintiff was positive for fatigue, some shortness of breath with exertion, as well as chronic neck and back pain associated with old injuries, but no muscle pain.  She had a history of depression that was remote and stated "that she does just fine now."  She was positive for about one migraine a month; she had no numbness, tingling weakness or paralysis.  R. 341, 367.

In November 2010, she presented for follow-up care with Anna Brunner, ARNP, of IMA and it was noted that she had been taking prescribed Lisinopril regularly and tolerating it well, but her blood pressure remained elevated.  R 338-39, 364-65.  She was started on Atenolol and enteric coated aspirin daily for additional cardiac protection. *Id.*  NP Brunner suspected Plaintiff had sleep apnea and recommended a sleep study which Plaintiff declined because she could not afford it.  *Id.*

Plaintiff continued her follow-up care at IMA and for physician interaction.

R. 335 (Jan. 14, 2011-NP Brunner), 360 (Mar. 21, 2011-Steven Spence, M.D.).  In

March 2011, Dr. Steven Spence, of IMA, noted her blood pressure had been high on a

significant basis.  Her blood pressure was described as uncontrolled.  R. 360.

Dr. Steven Spence increased Plaintiff's prescription for Lisinopril and continued

Atenolol.  She was appearing in no acute distress.  *Id*.  (Plaintiff states that this is the

last patient record from IMA in the record.  R. 360; doc. 14 at 23.)

In December 2010, it appears NP Brunner referred Plaintiff to Vechai L.

Arunakul, M.D., with Chipola Surgical Associates for a colonoscopy after a heme+ stool.

R. 336-37, 362-63.  (It appears that Dr. Steven Spence initialed the patient notes.  *See*

R. 337, 360; *see also* R. 362-63).

On April 11, 2011, Plaintiff presented to Dr. Arunakul.  R. 388.  She also had an

abscess and chronic drainage in her left breast which was eventually excised and

biopsied by Dr. Arunakul in July 2011.  R. 388, 391, 431.

In August of 2011, Plaintiff presented for follow-up treatment and Dr. Arunakul

noted that she complained of arthralgias.  R. 493.  Dr. Arunakul indicated a history of

heme+ stool and intermittent dysphagia/GERD.  *Id*.  In November 2011, Dr. Arunakul

noted that Plaintiff had the following symptoms: decreased energy, double vision,

blurred vision, hard of hearing, trouble swallowing, shortness of breath, chest pain,

angina, difficulty walking, abdominal pain and diarrhea, heartburn, hemorrhoids,

bleeding with bowel movements, arthralgias, varicose veins, and headaches.  R. 489-

90.

In July 2011, Richard M. Christopher, M.D., of Jackson Hospital, diagnosed

Plaintiff with hypertension.  R 432.  Dr. Christopher noted that Plaintiff had a normal

sinus rhythm and supraventricular ectopy was rare, but did include one 4-beat and one 8-beat run of what appeared to be atrial fibrillation with aberrancy and a ventricular rate between 130 and 150.  *Id*.  An echocardiogram revealed mild symmetrical hypertrophy and Stage 1 diastolic dysfunction in the left ventricle.  R. 434.  Mild insufficiency was present in the trileaflet aortic valve.  *Id*.  The mitral valve and tricuspid valve both demonstrated mild insufficiency.  *Id*.

A nuclear myocardial scan perfusion stress study in August 2011 was completed because of Plaintiff's chest pain, dyspnea, and coronary risk factors including hypertension and family history.  R. 426.  The regional function study showed moderate hypokinesis in the septal segment.  *Id*.  The global left ventricular function was normal, but the left ventricular regional wall motion was noted to be abnormal.  *Id*.  Glenn L. Clark, M.D., a radiologist, concluded that in spite of the regional function abnormality observed, the findings indicated a very low risk for hard cardiac events.  *Id*.  A stress test administered by Dr. Steven Spence also revealed a hypertensive cardiovascular response when off medicines and no evidence for reversibility or ischemia by exercise cardiolite imaging.  R. 428.[4]

On February 29, 2012, Plaintiff returned for primary care with Dr. Akerson at PFCA and reported muscle pain, joint pain, and limitation of motion.  She denied abdominal pain, chest discomfort, constipation, diarrhea, fever, headaches, hematuria, hemoptysis, and light headedness.  R. 460.  It is noted: "First time pt here to establish care and to discuss medications."  *Id*.  She "is followed for fibromyalgia [and]

---

[4]  There is a November 9, 2011, note in the record describing a new medical diagnosis: "Claimant reported 11/09/11 that she was diagnosed 10/2011 with fibromyalgia by Dr. Steven Spence at [IMA].  She is now taking new medication: Flexeril, Cymbalta, Cetirizine, Omoprazole [sic], Sucralsate."  R. 304.

hypertension.  *Id.*  "The patient has not been seen by any other care providers since the last visit."  *Id.*  (It appears that Plaintiff's last visit with PFCA was on March 26, 2007, with Dr. John A. Spence.  R. 466-67, 485-86.)  Plaintiff denied fatigue, double vision and changes in vision, chest pain, syncope, nausea, vomiting, and diarrhea, among others.  R. 461.  She denied anxiety and delusions.  *Id.*  She admitted joint and muscle pain, and limitation of motion, but denied joint swelling.  *Id.*  She was alert and in no acute distress.  *Id.*  She was assessed as having essential hypertension and myalgia.  R 462.  Her mood and affect were appropriate.  *Id.*  Plans were made to give her Savella starter packs and try to get her assistance for Cymbalta.  *Id.*

On August 14, 2012, Plaintiff presented to Dr. John A. Spence with PFCA, and complained of pain all over and that Cymbalta was not working.  R. 457.  It is noted that Plaintiff's "benign essential hypertension" and "pain in join, forearm" dated back to March 26, 2007.  R. 457; *see* R. 466 (Mar. 26, 2007, visit with Dr. John A. Spence.)  She denied altered mental status, muscular weakness, tingling or numbness, and difficulty concentrating.  She denied anxiety, depression, and difficulty sleeping.  She denied nausea, vomiting, diarrhea, constipation, and loss of appetite.  R. 458.  She was assessed as having fatigue and generalized pain and started on Savella.  R. 459.

In a follow-up medication appointment on August 23, 2012, with Dr. Akerson, Plaintiff reported hurting all over in her hips and not being able to drive.  R. 454.  It is noted she "is followed for fibromyalgia."  *Id.*  She was wearing a knee brace and stated that the knee "hurts when goes forward" with the pain being worse than child birth.  *Id.*  She reported increased pain and stated she had been compliant with taking medications as directed.  *Id.*  She denied abdominal pain, chest discomfort,

constipation, diarrhea, feeling depressed, fever, headaches, hematuria, and hemoptysis.  *Id.*  She again reported fatigue, joint pain, and limitation of motion.  R. 455. She was overweight, well-developed, alert, in no acute distress, well-dressed appearance, and normal body habitus.  *Id.*  Her mood was normal and affect was appropriate.  R. 456.  She was assessed as having myalgia and started on Ultram, and prescribed Tramadol and Flexeril as needed, and Etodolac for fibromyalgia.  *Id.*

A September 6, 2012, patient note lists Dr. Akerson as the provider, although the "instructions" portion of the patient notes state: "[r]eviewed and seen by Dr. Spence." R. 453.  Plaintiff reported feeling pain all over.  R. 451.  She presented "for a[n] 8 months history of mild to moderate of feeling tired.  She states the symptoms have been waxing and waning over time but gradually worsening."  *Id.*  She complained of joint and hip pain and stated medications were not working.  *Id.*  She denied altered mental status, muscular weakness, tingling or numbness, and difficulty sleeping.  R. 452.  She denied anxiety and depression.  *Id.*  She denied nausea, vomiting, diarrhea, constipation, and loss of appetite.  *Id.*  She was grossly oriented to person, place, and time and her mood was normal and affect appropriate.  R. 453.  She was assessed as having fatigue and was prescribed Lyrica.  *Id.*  Etodolac and other medicines were prescribed on the medication list again.  R. 451. Fibromyalgia is not mentioned.  R. 451-53.  Plaintiff was to follow-up with Dr. Akerson in two weeks.   R. 453.

### C.  Opinion Evidence

On March 17, 2011, Plaintiff presented for a consultative examination conducted by Sam R. Banner, D.O.  R. 354; *see* R. 32 for the ALJ's detailed summary of

Dr. Banner's findings that are incorporated herein by reference.[5]  Plaintiff reported being involved in a motor vehicle accident in 1996 with injury to her neck, low back, hips, and right shoulder.  *Id*.  She reported being diagnosed with degenerative disc disease in her cervical and lumbar spine and stated that it was affecting her right and left sciatic nerve. *Id*.  She reported being told she suffered nerve damage to her right shoulder and subsequently had difficulty raising her right arm.  She reported being unable to sit, stand, or walk for prolonged periods and having difficulty getting in and out of a chair. *Id*.  She reported pain while lying flat, causing difficulty with sleep.  *Id*.  She reported not having "any medical care since approximately 2004."  *Id*.  "She states her pain is progressively getting worse.  Worker's Compensation case settled in August 2004."  *Id*. Dr. Banner observed that a seated leg raising test caused bilateral hip pain.  R. 357.  He diagnosed Plaintiff with chronic neck and low back pain secondary to motor vehicle accident injuries in 1996, bilateral carpal tunnel post-operative right and left, and hypertension.  *Id*.  He concluded Plaintiff needed continued medical care and that she gave satisfactory effort in participating in the examination.  *Id*.

On May 11, 2011, Jesse Palmer, M.D., a non-examining acceptable medical source, provided a cryptic analysis noting: "I have reviewed all the information in the file as well as the RFC dated 3/29/2011, which is affirmed as written."  R. 402.  Dr. Palmer

---

[5]  The ALJ considered Dr. Banner's report and found that his "findings are generally consistent with the overall evidence of record received at the hearing level and ultimately support a finding of "not disabled."  Accordingly, I afford his assessment some weight.  Detailed above and below, I have fully accounted for Dr. Banner's suggested limitations that are supported by the record in forming the claimant's [RFC]. Dr. Banner did not have the benefit of reviewing all the evidence received at the hearing level prior to making his assessment."  *Id*.

was referring, in part, to the Physical [RFC Assessment performed by Aleya Garrett, a single decisionmaker on March 29, 2011.  R. 102-09.  The ALJ summarized Dr. Palmer's assessment, which is essentially Garrett's assessment.  R. 34.  The ALJ afforded "his [Dr. Palmer's] opinions less than significant weight."  *Id.*

On May 21, 2011, Plaintiff presented for another consultative examination with consultative clinical psychologist Nicole Mannis, Psy.D., at Tri-State Psychology, LLC.  R. 403.  Plaintiff reported "that she is having difficulty with, 'knee pain, hip pain, back pain, shoulder pain, high blood pressure, and depression.'"  *Id.*  Plaintiff reported that she did household chores and required extended time and multiple breaks to complete these activities due to physical difficulties.  R. 403-04.  Dr. Mannis noted Plaintiff's posture and gait were stiff and awkward.  She had no difficulty understating questions and statements.  R. 404.  Her mood was depressed and emotional expression was variable though generally teary.  *Id.*  She reported daily difficulties with crying episodes.  *Id.*  She denied suicidal ideation, intent, or plan.  *Id.*  Plaintiff's attention and concentration appeared to be goof based upon responsivity to the queries and completion of simple mathematics.  *Id.*  Her long and short-term memory appeared good.  *Id.*  Dr. Mannis diagnosed opioid dependence, in remission and major depressive episode, recurrent, moderate.  *Id.*  Her prognosis indicated Plaintiff's mood symptomology appeared to be appropriate for further psychotropic intervention or outpatient counseling.  *Id.*  "Completion of self-care activities and household chores is independent."  *Id.*  Plaintiff "appears capable of appropriate social interaction with known individuals and new acquaintances."  *Id.*  "Concentration and task persistence was good."  *Id.*  Regarding Plaintiff's ability to perform work-related activities, Dr. Mannis

noted: Plaintiff "appears capable of work-activities involving social interaction, independent decision-making, and simple supervised activities." R. 405.[6]

On May 26, 2011, Plaintiff participated in a Psychiatric Review Technique conducted by Judith Meyers, Psy.D., a non-examining consultant. R. 407.[7] Dr. Meyers' medical dispositions included impairment(s) not severe and coexisting non-mental impairment(s) that requires referral to another medical specialty. *Id.* Dr. Meyers concluded Plaintiff had *no* difficulties in restriction of activities of daily living, *no* difficulties in maintaining social functioning, and *mild* difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration. R. 417; *see* R. 419 (consultant's notes supporting Dr. Meyer's opinions).

On November 6, 2012, Dr. Akerson, completed a RFC Questionnaire regarding Plaintiff's impairments and resulting limitations. R. 507-10. (Plaintiff's last prior visit with Dr. Akerson was on August 23, 2012. R. 454.) Dr. Akerson described the length of the treating relationships beginning on July 8, 2005. R. 507.[8] He listed Plaintiff's diagnosis as fibromyalgia and described her prognosis as "not good." *Id.* He indicated

---

[6] The ALJ considered Dr. Mannis' report and afforded "her assessment some weight." R. 32. The ALJ noted that she had accounted for Dr. Mannis' suggested limitations that were supported by the record in forming Plaintiff's RFC. *Id.*; *see* R. 27-28.

[7] The ALJ considered Dr. Meyers' report and noted that her findings supported a finding of "not disabled." R. 34. The ALJ determined, however, that Plaintiff was somewhat more limited and, therefore, gave Dr. Meyers' opinions "less than significant weight," although the ALJ accounted for the suggested limitation in forming Plaintiff's RFC. *Id.*; *see* R. 27-29.

[8] *See supra* at n.4. Dr. Akerson noted that Lunesta, Maxalt, Phenergan, and Ultracet were started on July 8, 2005. R. 451. A patient note of February 29, 2012, referred to the start date of these medications and Lortab, and Amoxicillin. R. 460.

that Plaintiff's symptoms relating to fibromyalgia included severe pain in her hips and legs as well as forgetfulness. *Id.* Dr. Akerson opined that Plaintiff's symptoms associated with her impairments are severe enough to interfere with the attention and concentration required to perform simple work-related tasks constantly. *Id.* He indicated that side effects of any medications which may impact Plaintiff's capacity for work include poor memory and being very sleepy. Dr. Akerson further opined that Plaintiff would need to recline or lie down during a hypothetical 8-hour workday in excess of the typical 15-minute break in the morning, the 30-60 minute lunch, and the typical 15-minute break in the afternoon. He indicated that Plaintiff cannot walk any city blocks without rest or significant pain. He noted the number of minutes Plaintiff can sit at one time as 20 and the number of minutes Plaintiff can stand/walk at one time as 30. He indicated that Plaintiff can sit during an 8-hour workday for a total of four hours and can stand/walk during an 8-hour workday for a total of four hours. He indicated that Plaintiff would need a job which permits shifting positions at will from sitting, standing or walking and that Plaintiff would need to take unscheduled breaks during an 8-hour workday two times per hour lasting 15-20 minutes each. *Id.* Dr. Akerson further opined that Plaintiff has limitations in doing repetitive reaching, handling or fingering, although Plaintiff can occasionally lift and carry 20 pounds or less but never 50 pounds. R. 508. He opined that Plaintiff can only engage in grasping, turning, and twisting of objects, fine manipulation and reaching for 10% of an 8-hour workday with both the right and left hand/arm. He opined that Plaintiff is likely to be absent from work as a result of her impairments or treatments more than four times a month. He indicated that she is not a

malingerer.  Dr. Akerson opined that Plaintiff is not capable of working an 8-hour day, 5 days a week employment on a sustained basis.  *Id.*[9]

On April 2, 2013, and post-hearing, *see* R. 79, 527, Plaintiff participated in a consultative examination conducted by E. Jacob, M.D., MRCP, a board certified neurologist.  R. 511-23.  Plaintiff's chronic knee, hip, neck and back pain were noted. R. 512.  She reported the knee pain is present more or less all the time, gets worse after working after 30 minutes, and feels like the knee is bending forward.  She reported the hip pain is constant and is made worse by standing, sitting, walking and lying down. She reported it is also impossible to lie on either side to make herself comfortable.  She indicated her neck pain is present all the time and radiates between the shoulder blades into the arms.  It is made worse when she is cleaning, dusting and vacuuming floors.  *Id.* She complained of weakness in both hands, dropping things, and numbness in both hands.  Plaintiff reported her low back pain is always present and is worse when standing up from a lying or sitting position.  It is made worse by prolonged sitting, standing, walking and bending and radiates from the back into the legs.  She reported her shoulder pain goes along with the neck pain and is made worse by doing her daily routines.  She reported she can stand up and wash dishes.  She reported she drives even though she has to take breaks every 30-40 minutes.  *Id.*  Dr. Jacob's examination

---

[9]  The ALJ considered Dr. Akerson's statement, but gave it little weight because of the assessment's inconsistency with the overall evidence of record at the hearing level and internal inconsistencies within the assessment when compared to Dr. Akerson's treatment notes (Exhibit 15F [R. 507-08] compared to 12F [R. 451-68] and 13F [R. 469-86]).  For instance, Dr. Akerson's contention that the claimant would need to recline and/or lie down throughout the work day in excess of normally allocated breaks, use her hands, fingers, and arms only 10% of the workday, and miss more than 4 day[s] of work a month is not supported by his treatment notes and/or the longitudinal medical record.  Dr. Akerson did not have the benefit of reviewing all the evidence received at the hearing level prior to making his assessment.  R. 34.

of the cervical spine showed limitation due to pain and Plaintiff also reported limitation

due to pain on examination of the shoulders.  R. 513; *see* R. 516 (range of motion

examination).  Under motor examination, Dr. Jacob noted: Plaintiff's tone, power and

coordination in the upper and lower extremities is normal; she walks normally and on

her toes and heels; she can stand on her right leg as well as her left leg; she can sit with

comfort with her knee fully flexed and put the opposite leg on top of the left knee and

take off her shoes and sock on both sides and the same thing can be done when she

put her socks and sneaker back on.  She has decreased reflexes in the upper and lower

extremities.  R. 514.  Dr. Jacob's impression included neck pain, low back pain, knee

pain, hip pain, a history of hypertension, and a status-post lumpectomy from the left

breast and apparently the lump was benign.  *Id.*

Dr. Jacob also completed a Medical Source Statement of Ability to Do Work-

Related Activities (Physical) and indicated Plaintiff can sit for two hours at one time

without interruption, stand for 30 minutes at one time without interruption, and walk for

30 minutes at one time without interruption.  R. 519.  He opined that Plaintiff can sit for a

total of 8 hours in an 8-hour work day, stand for a total of four hours in an 8-hour work

day, and walk for a total of two hours in an 8 hour work day.  *Id.*  He opined that she can

frequently handle, finger, feel, and push/pull with both hands.  R. 520.  He did not

indicate specific limitations in reaching, but noted Plaintiff's reports of pain and limitation

of abduction in the shoulder.  *Id.*  Dr. Jacob opined that Plaintiff can occasionally climb

stairs and ramps, ladders or scaffolds, balance, stoop, kneel, crouch, and crawl.

R. 521.  He indicated that his assessment was based on limitation due to reported pain

and that Plaintiff can do these activities (climbing, balancing, stooping, etc.) more if she

gradually increases these activities.  He opined that Plaintiff can occasionally tolerate exposure to unprotected heights and moving mechanical parts and can frequently tolerate exposure to operating a motor vehicle.  R. 522.[10]

### D.  Hearing Testimony

Plaintiff testified that the pain in both knees and both hips has gotten so bad that she has to stand up then sit down and rest for a few minutes before going back to what she was doing.  R. 52.  Since her surgery for bilateral carpal tunnel syndrome which included two surgeries on the left side, the last two fingers of her left hand do not always open and close.  She has problems grasping and holding onto things.  She wears a brace on her left hand to prevent it from going to sleep when she is gardening.  R. 65. Her knees feel like they want to bend forward and buckle out from under her a lot. R. 52.  She has fallen and uses a stick as a homemade cane every time she walks around outside on uneven ground.  R. 53.  She does not use a stick inside, but relies on furniture and walls to grab.  *Id.*  She has really painful hip pain and cannot sit for long periods.  *Id.*  She wakes up at night and has to change position constantly to get comfortable.  *Id.*

She cannot ride for long distances and had to stop to get out and walk around on her way to the hearing, a trip which was two hours long.  R. 53-54.  Her neck and lower back pain started when she was in a wreck in 1996 and has gotten worse.  R. 54.  Her blood pressure is currently under control with medication, but the medications she has

---

[10]  The ALJ considered Dr. Jacobs' assessment and found his findings to be "generally consistent with the overall evidence of record and ultimately supported a finding of 'not disabled.'"  R. 33.  The ALJ afforded his assessment "some weight" and accounted for his "suggested limitations that are supported by the record in forming" Plaintiff's RFC.  *Id.*

tried for the pain including Celebrex and Lyrica work for a little while and then cause
dizziness and skyrocketing blood pressure.  R. 54, 55, 63.  The Lyrica she takes
currently helps with the pain somewhat, but it has made her loopy and want to just lie
down and go to sleep.  R. 54-55.

She stated that Dr. Akerson monitors her medications and though they have
tried, they have not been able to find anything that works 100 percent.  R. 63.  She
takes Nexium for her stomach issues with some relief.  *Id.*  On a good day, she can walk
two or three blocks before she has to stop and take a break.  R. 56.  She calls ahead to
the pharmacy so her medication is ready when she gets there.  *Id.*  She uses a stool in
her kitchen when she does dishes or cooks and has done so since 1998.  R. 56, 65.
She uses a cart to hold on to when grocery shopping and can shop for about 20
minutes before she starts to really hurt.  R. 56.  She can sit 20-25 minutes before she
has to get up to relieve her back and hips.  *Id.*  She can lift her laundry basket as long
as the clothes are not wet.  R.57.  Since the wreck in 1996, she cannot reach overhead
with her left arm and feels a sharp, shooting pain when she moves her arm.  *Id.*  She
can type on a computer or dial a phone for a little while and she has a reduced sense of
feeling in her left hand.  *Id.*  She is unable to get back up after bending over or stooping
because of her knees.  R. 58.  On bad days, the pain is so bad she does not want to get
up or move and she moves from the bed to the recliner and then back to the bed to try
and alleviate the pain.  R. 59.  Three out of five days are usually bad days.  R. 60.  On a
good day, she does a little bit of dusting, sweeping, and vacuuming.  *Id.*

On a typical day, she spends a couple hours laying down trying to ease her hip
pain.  R. 63.  Her doctors have said her hip pain is due to fibromyalgia which has

progressed to attack the weaker spots in her body.  R. 64.  The pain level in the last two

years has progressively gone from a 5 to a 20.  *Id*.  When she cleans one house a

week, it takes her five to six hours and she spends probably half of that time taking a

break because of her pain.  R. 62.  It used to take her three hours to clean the house

and now it takes her five.  *Id*.  She has trouble remembering things when she tries to

read books or watch television shows.  R. 58-59.  She continues to have problems

stemming from the abscess that was in her left breast and doctors have had difficulty

identifying why the issue continues.  R. 61.  She has been told that if it is still there when

she goes for another mammogram, they are going to operate on the breast again.

R. 61.[11]

### E.  Vocational Expert Testimony

The vocational expert, Mr. Strader, was asked the following hypothetical question

regarding whether Plaintiff would be able to perform any of her prior work:

> [A]ssume an individual of the Claimant's age, education and work experience
> who's able to perform light work; who would need the benefit of a sit/stand at will
> option; who would never be able to climb ladders, ropes, or scaffolds; who
> occasionally could climb ramps or stairs; occasionally balance, stoop, crouch,
> kneel, or crawl; and who would have the ability -- who would not be able to use
> the left non-dominant arm for overhead reaching but reaching in all other
> directions would be constant; and who would be limited to frequent gross and
> fine manipulation with the left non-dominant hand but with the right it would be
> constant gross and fine manipulation; and who should avoid concentrated
> exposure to excessive vibration, moving machinery, and unprotected heights.

R. 67.

---

[11]   The ALJ considered Plaintiff's hearing testimony and other pre-hearing
statements.  R. 27-28, 30-31.

Mr. Strader testified that such an individual would not be able to perform any of Plaintiff's past work.  *Id.*  Mr. Strader testified that in the light, unskilled category, jobs as a ticket taker, office helper, and ticket seller would be appropriate for such a person. R. 67-68; *see supra* at 4 and n.2.  Mr. Strader testified that if an additional limitation to simple, routine, and repetitive tasks due to medication side effects or pain distraction were added, such an individual would still be able to perform those jobs.  R. 68.  Such jobs would permit one absence monthly and the typical breaks would include one approximately 15-minute break in the morning, one 15-minute break in the afternoon, and then a lunch break which varies.  *Id.*  When additional limitations included a constant interference with the ability to maintain attention and concentration during the workday that would be necessary to perform simple work-related tasks, the need to lay down or recline in excess of the typically allowed breaks during the workday, the requirement of two unscheduled breaks per work hour each lasting between 15 and 20 minutes, and the expectation of more than four absences per month as a result of the individual's impairments, Mr. Strader testified that such an individual would be unemployable.  R. 69.

## V. Legal Analysis

### A.  Legal standards in fibromyalgia cases pre- and post-dating SSR 12-2p, effective July 25, 2012.

The American College of Rheumatology has stated that fibromyalgia is both real and difficult to confirm.  *See generally* Frederick Wolfe, *et al.*, The American College of Rheumatology Preliminary Diagnostic Criteria for Fibromyalgia and Measurement of Symptom Severity, 62 Arthritis Care & Research 600 (May 2010).  An extensive body of case law pre-dates the effective date of SSR 12-2p relating to courts' treatment of social

security disability claims based on fibromyalgia.  See <u>Johnson v. Colvin</u>, Case No. 1:14cv149-WS/CAS, 2015 U.S. Dist. LEXIS 55388, at *31-38 (N.D. Fla. Mar. 25, 2015), *adopted*, 2015 U.S. Dist. LEXIS 55381 (N.D. Fla. Apr. 27, 2015), for a discussion of the legal standards in fibromyalgia cases pre-dating SSR 12-2p and a discussion of SSR 12-2p.

Chronic pain, multiple painful points on the body, fatigue, and sleep deprivation are hallmark symptoms of fibromyalgia:

> The Ninth Circuit has described fibromyalgia as a "rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue.  Common symptoms . . . include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease."  *Benecke v. Barnhart*, 379 F.3d 587, 589-90 (9th Cir. 2004).

<u>Davis v. Astrue</u>, 287 F. App'x 748, 762 (11th Cir. 2008) (unpublished).[12]  The signs of fibromyalgia, according to American College of Rheumatology guidelines, are primarily tender points on the body.  <u>Green-Younger v. Barnhart</u>, 335 F.3d 99, 107 (2d Cir. 2003).  In <u>Green-Younger</u>, the court said: The claimant there "exhibited the clinical signs and symptoms to support a fibromyalgia diagnosis under the American College of Rheumatology (ACR) guidelines, including primarily widespread pain in all four quadrants of the body and at least 11 of the 18 specified tender points on the body."  *Id.*

A patient's subjective complaint "is an essential diagnostic tool" for the treating physician.  <u>Green-Younger</u>, 335 F.3d at 107 (quoting <u>Flanery v. Chater</u>, 112 F.3d 346, 350 (8th Cir. 1997)).  Moreover, it is relevant to the weight of a treating physician's opinion that he or she has "personally monitored the effectiveness of various therapies

---

[12]  Unpublished decisions of the Eleventh Circuit are not binding precedent.  *See* 11th Cir. R. 36-2.

and found that they failed to provide any significant improvement." *Id.* *See* <u>Cox v.</u> <u>Barnhart</u>, 345 F.3d 606, 609 (8th Cir. 2003) (finding treating physician's opinion not conclusory in fibromyalgia case when it was the "culmination of numerous visits [plaintiff] had with her past doctors, and his experience with treating her chronic pain").

It is a misunderstanding of the nature of fibromyalgia to require "'objective' evidence for a disease that eludes such measurement." <u>Green-Younger</u>, 335 F.3d at 108. "Moreover, a growing number of courts, including our own . . . have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease.'" *Id.* (citations to cases from 6th, 8th, and 9th Circuits omitted). "[P]hysical examinations will usually yield normal results--a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." *Id.* at 108-09 (citation omitted). "[S]welling of the joints is not a symptom of fibromyalgia . . . ." <u>Sarchet v. Chater</u>, 78 F.3d 305, 307 (7th Cir. 1996).[13] *See* <u>Brown v.</u> <u>Barnhart</u>, 182 F. App'x 771 (10th Cir. 2006) (unpublished). The Eleventh Circuit adopted this reasoning in an unpublished decision, <u>Stewart v. Apfel</u>, No. 99-6132, 245 F.3d 793, 2000 U.S. App. LEXIS 33214, at *8-9 (11th Cir. 2000) (table).

In <u>Moore v. Barnhart</u>, while acknowledging that <u>Stewart</u> is not binding precedent, the court said:

---

[13] "There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and -- the only symptom that discriminates between it and other diseases of a rheumatic character --multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch. All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch." <u>Sarchet</u>, 78 F.3d at 306-07.

In *Stewart*, we reviewed medical research on fibromyalgia, which often lacks medical or laboratory signs, and is generally diagnosed mostly on an individual's described symptoms.  Because the impairment's hallmark is thus a lack of objective evidence, we reversed an ALJ's determination that a fibromyalgia claimant's testimony was incredible based on the lack of objective evidence documenting the impairment.  *Id.* at *9, n.4.

405 F.3d at 1211 n.3.  *See* Somogy v. Comm'r of Soc. Sec., 366 F. App'x 56, 63-64

(11th Cir. 2010) (unpublished).

The Social Security Administration issued SSR 12-2p to assist factfinders in the

evaluation of fibromyalgia.  SSR 12-2p, 2012 SSR LEXIS 1, at *1.  Social Security

Ruling 12-2p "provides that once a claimant is determined to have fibromyalgia her

statements about symptoms and functional limitations are to be evaluated according to

the two-step process set forth in SSR 96-7p, 1996 SSR LEXIS 4."  Tully v. Colvin, 943

F. Supp. 2d 1157, 1165 (E.D. Wash. 2013); *see* SSR 12-2p, 2012 SSR LEXIS, 1 at *13.

"These policies provide that '[i]f objective medical evidence does not substantiate the

person's statements about the intensity, persistence, and functionally limiting effects of

symptoms, we consider all other evidence in the case record.'"  *Id.* (quoting SSR 12-2P,

2012 SSR LEXIS 1); *see* Evaluation of Fibromyalgia, 77 Fed. Reg. 43,640 (July 25,

2012).

Social Security Ruling 12-2p provides guidance regarding the documentation

needed, other sources of evidence, and what can be done if the evidence is insufficient.

Guidance is also provided regarding how FM is considered in the five-step sequential

evaluation process.  SSR 12-2p, 2012 SSR LEXIS 1, at *9-19.

Social Security Ruling 12-2p provides that the Social Security Administration "will

find that a person has an MDI of FM if the physician diagnosed FM and provides the

evidence we describe in section II.A. *or* section II.B., *and* the physician's diagnosis is

not inconsistent with the other evidence in the person's case record."  SSR 12-2p, 2012 SSR LEXIS 1, at *4-5 (emphasis added).  Sections II.A. and II.B. include *two sets of criteria for diagnosing fibromyalgia*-the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia *or* the 2010 ACR Preliminary Diagnostic Criteria.  *Id.*

The first set of criteria (1990) requires that the claimant demonstrate: (1) a history of widespread pain; (2) at least 11 positive tender points[14] on physical examination and the positive tender points must be found bilaterally, on the left and right sides of the body and both above and below the waist; *and* (3) evidence that other disorders, which could cause the symptoms or signs were excluded.  SSR 12-2p, 2012 SSR LEXIS 1 at *5-7 (§ II.A.1.-3. criteria).  Social Security Ruling 12-2p provides a picture of the back and front view of the body and includes 18 "tender point sites."  SSR 12-2p, 2012 SSR LEXIS 1, at *7; s*ee* Evaluation of Fibromyalgia, 77 Fed. Reg. 43,640 at 43,642 (July 25, 2012).

The second set of criteria (2010) requires that the claimant demonstrate: (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions[15]; *and* (3) evidence that other disorders

---

[14]  The criteria in section II.B. of SSR 12-2p may be used "to determine an MDI of FM if the case record does not include a report of the results of tender-point testing, or the report does not describe the number and location on the body of the positive tender points."  2012 SSR LEXIS 1, at *6 n.6 (§ II.A.2.b.).  In other words, tender-point testing under section II.A.2. may not be the exclusive manner to determine an MDI of FM.

[15]  Symptoms and signs that may be considered include the "(s)omatic symptoms" referred to in Table No. 4, "Fibromyalgia diagnostic criteria," in the 2010 ACR Preliminary Diagnostic Criteria.  We consider some of the "somatic symptoms" listed in Table No. 4 to be "signs" under 20 C.F.R. 404.1528(b) and 416.928(b).  These "somatic symptoms" include muscle pain, irritable bowel syndrome, fatigue or tiredness, thinking or remembering problems, muscle

that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions[16] were excluded.  SSR 12-2p, 2012 SSR LEXIS 1 at *7-9.  *See also* Lillard v. Comm'r, Soc. Sec., Civil Case No. JKB-13-1458, 2014 U.S. Dist. LEXIS 66720, at *6 n.1 (D. Md. May 14, 2014).

### B.  Substantial evidence supports the ALJ's determination that Plaintiff's subjective complaints of fibromyalgia are not a medically determinable impairment at step two.

Plaintiff bears the burden of proving that she is disabled, and consequently, is responsible for producing evidence in support of her claim.  *See* 20 C.F.R. § 416.912(a); Moore v. Barnhart, 405 F.3d at 1211.  The responsibility of weighing the medical evidence and resolving any conflicts in the record rests with the ALJ.  *See* Battle v. Astrue, 243 F. App'x 514, 523 (11th Cir. 2007) (unpublished).  No error has been shown.

At step two, the issue is whether the claimant has shown that he or she has a condition that has more than "a minimal effect on her ability to: walk, stand, sit, lift, push, pull, reach, carry, or handle, etc."  Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521).  To be considered "severe," a medical condition must constitute more than a "deviation from purely medical standards of bodily

---

weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms.

2012 SSR LEXIS 1, at *8 n.9.

[16]  *See* SSR 12-2p, 2012 SSR LEXIS 1, at *9 n.10 for a list of these conditions.

perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

"[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which

has such a minimal effect on the individual that it would not be expected to interfere with

the individual's ability to work, irrespective of age, education, or work experience.'"

Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986) (citing Brady v. Heckler, 724

F.2d 914, 920 (11th Cir. 1984), Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984),

and Flynn, 768 F.2d at 1274.  "Step two is a threshold inquiry.  It allows only claims

based on the most trivial impairments to be rejected.  The claimant's burden at step two

is mild. . . .Claimant need show only that her impairment is not so slight and its effect is

not so minimal."  McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying

Brady).  It was been said that step two of the sequential analysis may do no more than

screen out de minimus claims.  Stratton v. Bowen, 827 F.2d 1447, 1453 (11th Cir.

1987).[17]

At step two, the ALJ considered whether Plaintiff's "subjective complaints of

fibromyalgia" should be considered a medically determinable impairment in light of SSR

12-2p.  R. 26.  The ALJ determined that "the longitudinal record is inconsistent with the

criteria in [SSR] 12-2p for evaluating fibromyalgia and does not support a finding of a

medically determinable impairment."  Id.  The ALJ discussed "[t]he diagnosis, relevant

history, medical evidence of record, opinions, and [RFC] assessment pertaining to the

---

[17]  The ALJ is not required, however, to identify all of the impairments that should
be considered severe.  See Heatly v. Comm'r of Soc. Sec., 382 F. App'x 823, 825 (11th
Cir. 2010) (unpublished); see also Mariarz v. Sec'y of Health & Human Servs., 837 F.2d
240, 244 (6th Cir. 1987).

claimant's medically determinable impairments" in her RFC findings, Finding 4.[18]  *Id.*

Consistent with SSR 12-2p, the ALJ weighed and discussed the opinions of

Plaintiff's treating physicians and other health care providers, the reports of medical

source consultants who examined Plaintiff and those who provided record reviews,

considered Plaintiff's longitudinal records, and assessed Plaintiff's credibility, which

included consideration of Plaintiff's hearing testimony and Plaintiff's statements made to

the SSA prior to the hearing.  R. 29-35.  Plaintiff does not argue that the ALJ omitted

consideration of any material evidence in the record.  Doc. 14 at 16-20.

After summarizing the relevant medical reports and reports from the consultants

and Plaintiff's pre-hearing statements and hearing testimony, the ALJ determined that

there were "[i]nconsistent reports and testimony from the claimant and the fact that the

record contains observations of generally stable examination findings, with some

improvement in condition when compliant with conservative treatment," which,

according to the ALJ, detracted "from the credibility of the claimant's allegations as to

her functional limitations and the severity of her alleged symptoms."  R. 33.  The ALJ did

not find Plaintiff's allegations "entirely credible."  *Id.*  The ALJ's observations are

supported by substantial evidence, particularly as they relate to the ALJ's earlier

determination that fibromyalgia is not a medically determinable impairment for Plaintiff.

---

[18]  At step three, the ALJ determined, in part, that Plaintiff had *mild* restrictions in
activities of daily living; *mild* difficulties in maintaining social functioning; *moderate*
difficulties in maintaining concentration, persistence, or pace "*overall* due to pain
distraction"; and *no* episodes of decompensation.  R. 26-29.  The ALJ considered
Plaintiff's reports of her daily activities, R. 30-31, and what Plaintiff reported to medical
sources.  R. 27-35.  "A claimant's daily activities may be considered in evaluating and
discrediting a claimant's subjective complaints."  Conner v. Astrue, 415 F. App'x 992,
995 (11th Cir. 2011) (citation omitted) (unpublished); Macia v. Bowen, 829 F. 2d 1009,
1012 (11th Cir. 1987).

Plaintiff states that she has been treated by Dr. Akerson at PFCA since July 8, 2005.  R. 507-08; see doc. 14 at 4; *see also supra* at 7-8.[19]  (This assertion is supported only by Dr. Akerson's November 6, 2012, RFC Questionnaire in which he referred to this date.  R. 507.).  It was not until February 29, 2012, that Dr. Akerson noted that Plaintiff appeared for the first time to establish care and to discuss medications.  R. 460. It appears that Plaintiff's last (prior) visit with Dr. John A. Spence with PFCA was on March 26, 2007.  R. 466-67, 485-86.  Plaintiff next visit with Dr. John A. Spence was on August 14, 2012.  R. 457-59.

On February 29, 2012, Plaintiff returned for primary care with Dr. Akerson at PFCA and reported muscle pain, joint pain, and limitation of motion.  She *denied* abdominal pain, chest discomfort, constipation, diarrhea, fever, headaches, hematuria, hemoptysis, and light headedness.  R. 460.  Plaintiff *denied* fatigue, double vision and changes in vision, chest pain, syncope, nausea, vomiting, and diarrhea, among others. R. 461.  She *denied* anxiety and delusions.  *Id.*  She *admitted* joint and muscle pain, and limitation of motion, but denied joint swelling.  *Id.*  She was alert and in no acute distress.  *Id.*  She was assessed as having essential hypertension and myalgia.  R 462. Her mood and affect were appropriate.  *Id.*  Plans were made to give her Savella starter packs and try to get her assistance for Cymbalta.  *Id.*  There is no indication that

---

[19]  There is no indication in this record that Dr. Akerson is a rheumatologist or specializes in other medical fields.  Generally, more weight is given to the opinion of a specialist "about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  20 C.F.R. § 416.927(c)(2), (5); *see* <u>Benecke v. Barnhart</u>, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (noting that "[s]pecialized knowledge may be particularly important with respect to a disease such as fibromyalgia that is poorly understood within much of the medical community," thus rheumatologists' opinions are entitled to greater weight than those of other physicians) (<u>Benecke</u> quoted in <u>Somogy</u>, 366 F. App'x at 65 n.13).

Dr. Akerson identified "at least 11 positive tender points on examination" and/or "repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions."  Plaintiff admitted to having joint and muscle pain, but denied other symptoms and signs that may be considered.  *See supra* at 27-28 n.15.

On August 14, 2012, Plaintiff presented to Dr. John A. Spence with PFCA, and complained of pain all over and that Cymbalta was not working.  R. 457.  This patient note states that Plaintiff's "benign essential hypertension" and "pain in join, forearm" dated back to March 26, 2007.  R. 457; *see* R. 466 (Mar. 26, 2007, visit with Dr. John A. Spence.)  She *denied* altered mental status, muscular weakness, tingling or numbness, and difficulty concentrating.  She *denied* anxiety, depression, and difficulty sleeping.  She denied nausea, vomiting, diarrhea, constipation, and loss of appetite.  R. 458.  She was assessed as having *fatigue* and generalized pain and started on Savella.  R. 459.  (Fatigue is a symptom and sign that may be considered in assessing fibromyalgia.  *See supra* at 27-28 n.15.

In a follow-up medication appointment on August 23, 2012, with Dr. Akerson, Plaintiff reported hurting all over in her hips and not being able to drive.  R. 454.  It is noted she "is followed for fibromyalgia," but there is no discussion of the underlying symptoms and signs that gave rise to Dr. Akerson's mention of fibromyalgia.  *Id.*  She was wearing a knee brace and stated that the knee hurt when it went forward with the pain being worse than child birth.  *Id.*  She reported increased pain and stated she had been compliant with taking medications as directed.  *Id.*  She *denied* abdominal pain, chest discomfort, constipation, diarrhea, feeling depressed, fever, headaches, hematuria, and hemoptysis.  *Id.*  She again reported *fatigue*, *joint pain*, and limitation of

motion.  R. 455.  She was overweight, well-developed, alert, in no acute distress, well-dressed appearance, and normal body habitus.  *Id.*  Her mood was normal and affect was appropriate.  R. 456.  She was assessed as having myalgia and started on Ultram, and prescribed Tramadol and Flexeril as needed, and Etodolac for fibromyalgia.  *Id.*

On September 6, 2012, Plaintiff reported to Dr. Spence feeling pain all over.  R. 451; *see supra* at 13.  She presented "for a[n] 8 months history of mild to moderate of feeling tired.  She states the symptoms have been waxing and waning over time but gradually worsening."  *Id.*  She complained of *joint and hip pain* and stated medications were not working.  *Id.*  She *denied* altered mental status, muscular weakness, tingling or numbness, and difficulty sleeping.  R. 452.  She *denied* anxiety and depression.  *Id.*  She *denied* nausea, vomiting, diarrhea, constipation, and loss of appetite.  *Id.*  She was grossly oriented to person, place, and time and her mood was normal and affect appropriate.  R. 453.  She was assessed as having *fatigue* and was prescribed Lyrica.  *Id.*  Etodolac and other medicines were prescribed on the medication list again.  R. 451.  Fibromyalgia is not mentioned.  R. 451-53.  Dr. Akerson and Dr. Spence do not identify "*repeated* manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions" to warrant a conclusion that Plaintiff has fibromyalgia or, if so, her diagnosis of fibromyalgia warrants the conclusion that it is a medically determinable impairment.

On November 6, 2012, Dr. Akerson, completed a RFC Questionnaire regarding Plaintiff's impairments and resulting limitations.  R. 507-10.  He listed Plaintiff's diagnosis as fibromyalgia and described her prognosis as "not good."  *Id.*  He indicated that Plaintiff's symptoms relating to fibromyalgia included severe pain in her hips and legs as well as forgetfulness.  *Id.*  Dr. Akerson opined that Plaintiff's symptoms

associated with her impairments are severe enough to interfere with the attention and

concentration required to perform simple work-related tasks constantly.  *Id.*  He

indicated that side effects of any medications which may impact Plaintiff's capacity for

work include poor memory and being very sleepy.  Dr. Akerson further opined that

Plaintiff would need to recline or lie down during a hypothetical 8-hour workday in

excess of the typical 15-minute break in the morning, the 30-60 minute lunch, and the

typical 15-minute break in the afternoon.  He indicated that Plaintiff cannot walk any city

blocks without rest or significant pain.  He noted the number of minutes Plaintiff can sit

at one time as 20 and the number of minutes Plaintiff can stand/walk at one time as 30.

He indicated that Plaintiff can sit during an 8-hour workday for a total of four hours and

can stand/walk during an 8-hour workday for a total of four hours.  He indicated that

Plaintiff would need a job which permits shifting positions at will from sitting, standing or

walking and that Plaintiff would need to take unscheduled breaks during an 8-hour

workday two times per hour lasting 15-20 minutes each.  *Id.*  Dr. Akerson further opined

that Plaintiff has limitations in doing repetitive reaching, handling or fingering, although

Plaintiff can occasionally lift and carry 20 pounds or less but never 50 pounds.  R. 508.

He opined that Plaintiff can only engage in grasping, turning, and twisting of objects,

fine manipulation and reaching for 10% of an 8-hour workday with both the right and left

hand/arm.  He opined that Plaintiff is likely to be absent from work as a result of her

impairments or treatments more than four times a month.  He indicated that she is not a

malingerer.  Dr. Akerson opined that Plaintiff is not capable of working an 8-hour day, 5

days a week employment on a sustained basis.  *Id.*

　　　The ALJ considered Dr. Akerson's Medical Source Statement, but gave it

little weight because of the assessment's inconsistency with the overall evidence of record at the hearing level and internal inconsistencies within the assessment when compared to Dr. Akerson's treatment notes (Exhibit 15F [R. 507-08] compared to 12F [R. 451-68] and 13F [R. 469-86]).  For instance, Dr. Akerson's contention that the claimant would need to recline and/or lie down throughout the work day in excess of normally allocated breaks, use her hands, fingers, and arms only 10% of the workday, and miss more than 4 day[s] of work a month is not supported by his treatment notes and/or the longitudinal medical record. Dr. Akerson did not have the benefit of reviewing all the evidence received at the hearing level prior to making his assessment.

R. 34.  The ALJ also thoroughly considered the reports of the examining and non-

examining consultants and afforded their opinions "some weight" or, in the case of

Dr. Palmer, "less than significant weight."  R. 32-34.  The ALJ determined that Plaintiff

was "somewhat more limited" than as found by the consultants Drs. Palmer and

Meyers, R. 34, and accounted for the limitations suggested by consultants,

Drs.  Banner, Mannis, and Jacob.  R. 32-33.

The ALJ ultimately concluded that Plaintiff had the "ability to perform a reduced

range of light work.  R. 35.  The ALJ's determination at step two that Plaintiff's

subjective complaints of fibromyalgia do not support a finding of a medically

determinable impairment is supported by substantial evidence and she correctly applied

the law.  *See* Land v. Astrue, Case No. 5:09cv369/SPM/MD, 2011 U.S. Dist. LEXIS

21694, at *22-24 (N.D. Fla. Jan. 6, 2011) (affirming Commissioner's denial of disability

benefits despite treating rheumatologist's impression of fibromyalgia), *adopted*, 2011

U.S. Dist. LEXIS 21773 (N.D. Fla. Mar. 3, 2011).  Like Land, this is not a case where a

treating rheumatologist (or any physician) determined that the patient had greater than

50% of positive points and, as a result, opined that the patient had fibromyalgia.  *See*

Land v. Astrue, 2011 U.S. Dist. LEXIS 21694, at *22-23 n.4.  In Land, and unlike this

case, the ALJ determined that giving the claimant the benefit of the doubt, the claimant

had fibromyalgia and that it was severe.  2011 U.S. Dist. LEXIS 21694, at *22.  The

ALJ, however, did not credit the claimant's subjective complaints of disabling pain and

determined that her fibromyalgia was not so severe as to be disabling from any work.

*Id.* at 22-24.  No error was shown, *id.,* as here.

### C.  Substantial evidence supports the ALJ's evaluation of the opinion of Dr. Akerson.

Plaintiff argues that the ALJ erred by failing to give great weight to the opinion of

Dr. Akerson, one of Plaintiff's treating physicians who opined that Plaintiff had

fibromyalgia, and ultimately opined that Plaintiff is dysfunctional as a result of her

fibromyalgia. R. 533; *see* doc. 14 at 20-21.  Plaintiff bears the burden of proving that

she is disabled, and consequently, is responsible for producing evidence in support of

her claim.  *See* 20 C.F.R. § 416.912(a); Moore v. Barnhart, 405 F.3d at 1211.  The

responsibility of weighing the medical evidence and resolving any conflicts in the record

rests with the ALJ.  *See* Battle v. Astrue, 243 F. App'x at 523.  Although a claimant may

provide a statement containing a treating physician's opinion of her remaining

capabilities, the ALJ must evaluate such a statement in light of the other evidence

presented and the ALJ must make the ultimate determination of disability.  20 C.F.R.

§§ 416.912, 416.913, 416.927, 416.945.

When evaluating the opinion of a treating source, ALJ must give "good cause" for

according less than substantial weight to the opinion of a treating physician.  *See*

Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004).  Good cause

discount a treating source's opinion exists when (1) the opinion is not bolstered by the

evidence, (2) the evidence supports a contrary finding, or (3) the treating physician's

opinion is conclusory or inconsistent with the doctor's own medical records.  *See*

Phillips, 357 F.3d at 1241.  "When the ALJ has articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error."  Weekley v. Comm'r of Soc. Sec., 486 F. App'x 806, 808 (11th Cir. 2012) (unpublished) (citing Moore v. Barnhart, 405 F.3d at 1212).

On November 6, 2012, Dr. Akerson completed a RFC Questionnaire.  R. 507-08. Dr. Akerson diagnosed Plaintiff with fibromyalgia.  Id.  He placed significant restrictions on Plaintiff's ability to work.  Id.; see supra at 16-19.

Although Dr. Akerson is one of Plaintiff's treating physicians and he noted that Plaintiff had several symptoms that might support a finding of fibromyalgia, such as joint, hip, and muscle pain and limitation of motion, and reports of fatigue, see, e.g., supra at 11-13, there is no indication in this record that he performed a multiple tender spot examination ("more precisely 18 fixed locations on the body") and determined that Plaintiff had "at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch," see Sarchet, 78 F.3d at 306-07 and Land v. Astrue, 2011 U.S. Dist. LEXIS 21694, at *22-24,[20] or repeatedly manifested the symptoms and signs described in SSR 12-2p, see supra at 27-28 n.15.  In fact, she routinely denied many of the listed symptoms and signs.  See, e.g., supra at 11-13. Plaintiff fared no better under the examination and treatment by other physicians and health care providers, including those at IMA.  See, e.g., supra at 7-13.

Further, a diagnosis of fibromyalgia does not automatically lead to a finding of disability.  See, e.g., Hernandez v. Comm'r of Soc. Sec., 523 F. App'x 655, 657 (11th

---

[20]  There is no mention in this record that Plaintiff was referred to or examined by a rheumatologist.

Cir. 2013) (unpublished).  When assessing a claimant's RFC, even when fibromyalgia is diagnosed, "a diagnosis or a mere showing of 'a deviation from purely medical standards of bodily perfection or normality' is insufficient; instead, the claimant must show the effect of the impairment on her ability to work." Wind v. Barnhart, 133 F. App'x 684, 690 (1th Cir. 2005) (unpublished) (quoting McCruter v. Bowen, 791 F.2d at 1547. In other words, only functional limitations determine disability.  Moore, 405 F.3d at 1213 n.6; McCruter v. Bowen, 791 F.2d at 1547.

Further, the ALJ considered the examination reports of the medical source consultants, R. 27-34, including Dr. Jacob, R. 512-23, who examined Plaintiff on April 2, 2013, at the request of the ALJ.  For the most part, the ALJ gave "some weight" to their opinions and accounted for their opinions (limitations) in her RFC determination to the extent they were consistent with the evidence in the record.  R. 30-35; *see* Crawford, 363 F.3d at 1159-60; Phillips, 357 F.3d at 1240-41.

Substantial evidence supports the weight the ALJ gave to Dr. Akerson's opinions.

### D.  Substantial evidence supports the ALJ's determination that Plaintiff could perform other work in the national economy and was not disabled.

At step four of the sequential evaluation process, the ALJ, with the assistance of the vocational expert, determined that Plaintiff could not perform any of her past relevant work with the RFC she assessed.  R. 35; *see* 20 C.F.R. § 416.920(a)(4)(iv). The ALJ proceeded, at step five, to determine whether Plaintiff could perform other jobs in the national economy.  *See* 20 C.F.R. § 416.920(a)(4)(v).  The respective burdens are set forth herein.  *See supra* at 5-6.

The ALJ sought the assistance of a vocational expert, Mr. Strader.  R. 65-69. Plaintiff contends that the ALJ improperly relied on Mr. Strader's opinion because the

ALJ did not include all of the limitations Dr. Akerson found related to Plaintiff's alleged fibromyalgia.  Doc. 14 at 22.  As previously discussed, substantial evidence supports the ALJ's determination that her fibromyalgia did not constitute a medically determinable impairment.  Furthermore, the ALJ properly accorded little weight to Dr. Akerson's opinion and substantial evidence supports her evaluation of his opinion.  An ALJ is "not required to include findings in the hypothetical that the ALJ improperly rejected is unsupported."  Crawford, 363 F.3d at 1161.  In other words, the ALJ was not required to accept Mr. Strader's opinion in response to a hypothetical question posed by Plaintiff's representative, *see* R.  69, when determining whether Plaintiff was capable of performing other jobs.  In fact, the ALJ expressly found to the contrary.  R. 36 ("I find that counsel's hypothetical question is not supported by the longitudinal medical record and/or the overall evidence received at the hearing level.  Accordingly, I afford the vocational experts responsive testimony no weight."  R. 36).  The ALJ properly relied on Mr. Strader's testimony to find that Plaintiff could perform jobs that existed in significant numbers in the national economy and was therefore not disabled.  *See* 20 C.F.R. § 416.969, 416.969a; Phillips, 357 F.3d at 1242-44.

**E.  The ALJ properly developed the record.**

Plaintiff argues that on November 9, 2011, Plaintiff reported to SSA that she was diagnosed with fibromyalgia by Dr. Steven A. Spence at IMA and "now taking new medication: Flexeril, Cymbalta, Cetirizine, Omoprazole [sic], Sucralsate."  *Id.*; *see* R. 304.  Based on this one paragraph report, Plaintiff contends the ALJ did not fully and fairly develop the record with additional records from IMA, and, therefore, erred.  Doc. 14 at 23-24.

As noted herein, Plaintiff bears the burden of proving that she is disabled, and consequently, is responsible for producing evidence in support of her claim.  *See supra* at 28.  On the other hand, an ALJ has a clear duty to fully and fairly develop the administrative record.  Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995); 20 C.F.R. §§ 416.912(d).  *See* Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) ("One of our recent opinions confirms, moreover, that an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.") (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*.")).

An ALJ is not required, however, to develop evidence to prove a claimant's claim or otherwise act as counsel to the claimant.  *See* Smith v. Schweiker, 677 F.2d 826, 829 (11th Cir. 1982).  An ALJ's basic duty to develop the record only requires her to ensure that there is sufficient evidence within the record to allow her to render an informed decision.  *See* Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999).  The question here is whether "the record reveals evidentiary gaps which result in unfairness or 'clear prejudice'" to Plaintiff.  Graham v. Apfel, 129 F.3d 1420, 1423 (11th Cir. 1997) (citing Brown v. Shalala, 44 F.3d at 934-35).

Plaintiff was represented by an attorney during the application review process and the administrative hearing.  R. 23, 43, 45, 195-96.[21]  Plaintiff was also represented by an attorney, albeit a new attorney, before the Appeals Council.  R. 329, 331, 360-76. The record does not indicate that Plaintiff, by and through her attorneys, advised the

---

[21]  Plaintiff does not challenge her representative's qualifications.  *See* Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir 2003.).

ALJ that relevant and material medical records may have been missing and otherwise available.

It was not until October 17, 2013, when Plaintiff's current representative argued before the Appeals Council, not the ALJ, that the ALJ did not properly develop the record by failing to request outstanding treatment records from IMA post-March 2011. R. 329, 331, 360-76 (Exhibit 4F); *see* doc. 14 at 23.  Also, it does not appear Plaintiff's counsel provided the Appeals Council or this Court with the additional records.  Doc. 14.

The ALJ considered Dr. Steven Spence's medical records through March 2011, R. 31, and Dr. Akerson's medical records through September 6, 2012, and his RFC Questionnaire of November 6, 2012, including his diagnosis of fibromyalgia.  R. 31, 34. Plaintiff does not advise the Court as to what any additional medical records would have added to the ALJ's or this Court's analysis of Plaintiff's argument.  The record does not show the kind of gaps in the evidence necessary to demonstrate prejudice.  *See* Graham v. Apfel, 129 F.3d at 1423.  No error has been shown.

## VI.  Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly followed the law.  Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **AFFIRMED** and the Clerk is **DIRECTED** to enter judgment for Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on September 3, 2015.

> s/  Charles A. Stampelos
> **CHARLES A. STAMPELOS**
> **UNITED STATES MAGISTRATE JUDGE**